IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CINDY L. DOERGE,

           Plaintiff,

vs.

Case No. 05-1019-JTM

CRUM'S ENTERPRISES, INC., et al.,

           Defendants.

MEMORANDUM AND ORDER

      Plaintiff Cindy Doerge has brought the present action against her former employer Crum's Enterprises, Inc., the operator of Crum's Beauty College, as well as against several individuals, including the owner and president of Crum's, Lucille Crum Jelinek, and against Jelinek's son, Charles Crum. Doerge was a nail instructor at the beauty college until she was terminated. She alleges that she was subjected to sexual harassment by Charles Crum. Doerge, who is white, also raises claims of race discrimination by the defendants. Finally, she also raises numerous claims under Kansas law. The matter is before the court on the defendants' Motion for Summary Judgment.

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Doerge was employed by Crum's Enterprises, Inc., which owns and operates Crum's Beauty College. Defendant Lucille Jelinek is the owner and president of Crum's. Doerge never signed a contract of employment with Crum's. According to Doerge, her employment was arranged in January 2002 and called for her to start in May, to be paid $400 for 37.5 hours of work a week, with a $1000 waiver of tuition for instructor's training, health and dental insurance, payment for license exams, and vacation and sick leave. There were no other terms of the employment. She did not commit to work a certain length of time and could quit anytime.

Doerge alleges in her federal Complaint, filed on January 21, 2005, that Jelinek made derogatory statements about her. She alleges students at the beauty college told her that in 2003 Jelinek had made derogatory comments about her to Rhonda Sharp, the owner of two beauty salons

in Junction City, to Cheryl Wilson and to Gloria at Dillard's. Doerge has presented an affidavit from one of the students stating that Jelinek referred to Doerge as the "town whore."

Doerge has no evidence of Jelinek or Charles Crum making any derogatory statements about her after January of 2004. The latest incident allegedly happened when Jelinek referred to Doerge as a whore when speaking to Alicia Campbell, a former employee of Crum's. This occurred sometime after March 13, 2003, after Jelinek learned Doerge had made official complaints after her termination. Campbell's opinion of Doerge was not changed by the comment; she did not believe it.

Doerge has no knowledge of any other derogatory comments by Lucille Jelinek or Charles Crum to any other potential employer for Doerge.

The first incident involving Charles Crum (occurring after January 21, 2003) happened on February 3, 2003. Doerge had photographs on a file cabinet of her boyfriend and family members. Crum walked into the room, looked at the photograph of her boyfriend and said, "I'll kick your ass." (Doerge dep. at 251-52).

On February 17, Doerge was observing a student giving a haircut to a client. Crum "kept walking by and kept leering" at the student. The client asked Crum to go away. Crum got in the client's face and said "I'm the president of this school," then left but continued to walk by three more times. Crum said nothing to Doerge on that occasion.

On February 25, Crum walked by Doerge on the clinic floor, said "Cindy, you better watch out," and gave her a "scrunched up face look." (Doerge dep. at 242-43).

On March 7, Doerge walked into the school's vending machine room, where the machines were being filled by Crum. Crum saw Doerge and said to her: "You're such a cunt, you need to get laid good and hard." (Doerge dep. at 242).

Doerge does not recall any other specific incidents with Crum from January 21 to her termination on March 13. She does claim that generally Crum would follow her, stand in the doorway of her classroom and stare and would try to touch her on the bottom.

Since her termination, Doerge has seen Charles Crum or Lucille Jelinek at stores but they have not seen her. The only occasion in which Charles Crum has communicated with Doerge since her termination occurred when Crum observed her as he drove by a gift shop that she was entering. Crum "flipped [her] off." (Doerge dep. at 239).

Doerge kept a diary in which she wrote down her complaints — made to Jelinek or other persons — about Crum. Asked if there were any complaints not recorded in the diary, Doerge responded, "I'm pretty sure I wrote that down." (Doerge at 211-12).

Doerge has also cited four incidents in which she alleges she was harassed by Jelinek prior to her termination. On November 22, 2002, Jelinek entered Doerge's class while she was teaching and asked why students were not taking clients, asking if they were lazy. Doerge said she was helping the students get ready to take a test. Jelinek told her she should "get her ass out on the clinic floor and forget about the students." (Doerge at 32-33)

On December 17, 2002, Jelinek called Doerge into her office and told her that she should teach some students theory while other students were with clients. Doerge complained that she could not teach theory while half of the students worked with clients, and that another instructor, Mrs. Foltz, did not teach that way. Jelinek replied that Foltz had a bigger class. (Foltz had about 25 students while Doerge usually had five or six.)

On December 20, Jelinek entered Doerge's classroom and asked one of the students why they were not taking clients. Doerge said that the students were getting ready to graduate and were reviewing and taking exams. Jelinek complained that the school was busy, that only four students were in her class, which was not enough, and that she was not making enough money from four students. Later that day, Jelinek called Doerge into her office. Doerge complained about Charles Crum sexually harassing her. Jelinek said that Charles didn't mean anything by it, and began to talk to Doerge about her needing to work 40 hours rather than 37.5.

On January 13 and 14, Doerge had closed the door to her classroom and posted a note stating that the students inside were studying for finals. Jelinek entered her classroom ostensibly to give

4

Doerge a magazine. Jelinek then complained that the students were not working, that one student was not wearing a coat and that Doerge was not in her classroom.

Doerge's complaint also alleges that derogatory racial language was used at the beauty college. The first of the four or five incidents of such language witnessed by Doerge happened on January 29, 2002, when she went to lunch with Jelinek and Crum to discuss becoming a nail instructor, taking the position of Betty Okao, who is of African heritage. According to Doerge, Jelinek referred to Okao as a "fucking nigger." (Doerge dep. at 212). Doerge told Ms. Jelinek "not to say that, that I didn't like it and that I liked Betty." Second, Doerge stated in her deposition that, sometime before September of 2002, she complained to Jelinek that Crum had referred to some African-American students as "colored girls." (Doerge dep. at 219-20). Third, Doerge also asserts that, at some time between September and December of 2002, she reported to Jelinek that Crum was bothering an African-American student named Precious Davis, "calling her a little colored girl" and "a pretty colored girl." (Doerge dep. at 220-21). Fourth, Doerge states that, in February of 2003, she complained to Ruth Chartier that Lucille had directed students not to sit on a couch that was between the offices of Chartier and Karla Givens, referring to those "colored girls" who disregarded the instructions. Finally, there may have been an additional fifth incident in March of 2003 in which Doerge complained to Chartier about Jelinek referring to a student's husband as a "lazy Mexican." But Doerge is not sure, and may have made that comment to Eydie Foltz, not Ruth Chartier. (Doerge 224:9 - 225:17). None of these incidents was recorded in Doerge's complaint diary.

On March 13, 2003, one of the students approached Doerge to tell her that Jelinek was criticizing the way Doerge managed her classroom. Doerge told Jelinek that she wanted to talk with her, and Jelinek came to Doerge's classroom. Doerge told Jelinek she was tired of her talking about Doerge to the students and fellow staff and of her harassment and told Jelinek that if she had any problems, she could talk to Doerge's attorney. Jelinek told Doerge she had better watch out, and then left.

Doerge's journal states the following with respect to the events of her termination:

5

> March 13, 2003
>     Today before noon, I asked Lucille Jelinek if I could talk to her. She said, 'No, she was in a hurry to go to lunch.'
>     I said, 'I need to talk to you in my classroom.'
>     Lucille Jelinek, 'No, let's go in my office!'
>     I said, 'No, lets go in my classroom, I need witnesses.'
>     So we go into my classroom. Three students were present: Becky Carbajal, Geralin Harp and Bridgette Lee.
>     I said, 'I'm tired of you harassing me everyday!'
>     Lucille Jelinek, 'You're crazy, you're a lier (sic)!.'
>     I said, 'No Lucy, I'm not crazy.' 'Lucy, you need to stop talking about me to the students and other instructors!'
>     Lucille Jelinek said, 'Your student asked me . . . ' (Then she stopped talking in the middle of the sentence and she looked up at Bridgette Lee.)
>     Lucille Jelinek said, 'I'm not going to talk to you about this here, we need to go into my office.'
>     I said, 'No, let's talk here.' Then I said, 'If you have a problem with me you can call my attorney!' (I handed her Sheila Hochhauser's business card.)
>     Then Lucille Jelinek threw the card on my desk and said, 'I don't need your lawyers name!'
>     Then Lucille Jelinek left my classroom mumbling something.
>     Then Lucille Jelinek turned to me and said, 'You better watch out!'

(Doerge Journal at D00202).

When the students left, Ms. Jelinek approached Doerge at the copy machine, told her that the nail department wasn't working out and that she was going to have to go. Jelinek pushed Doerge out of her office.

Doerge was terminated that day.

Doerge submitted a wage claim to the Kansas Department of Human Resources, which, after a hearing, concluded that Doerge was entitled to two weeks' wages. The agency concluded that Doerge had continued to work after her termination with knowledge that Crum's Enterprises did not consider her an employee to be paid but rather to be a student in instructor's training. Crum's paid the two weeks' wages, and the payment was accepted by Doerge "because I was broke." (Doerge dep. at 261).

Doerge also submitted complaints about Crum's to the Kansas Human Rights Commission, the Kansas Board of Cosmetology and the U. S. Department of Education. Each of those complaints related to discrimination or retaliation. The complaint filed by Doerge with the Kansas Human

6

Rights Commission marks boxes for sex discrimination and retaliation as the basis for her complaint, but does not mark the box for race discrimination. Additionally, in connection with her complaint to the KHRC, Doerge completed a questionnaire regarding her employment for the KHRC. Her entries in the questionnaire include no complaint regarding race. The KHRC issued a probable cause finding on April 19, 2004.

On September 17, 2004, the KHRC dismissed Doerge's charge because they were notified that a complaint had been filed in U.S. District Court. Eleven days later, the KHRC withdrew the dismissal but advised Doerge's counsel it was "closing your client's case and placing it in our inactive files effective this date."

**Conclusions of Law**

The defendants first seek dismissal of Doerge's race-based claims under 42 U.S.C. §§ 1981 and 1985, as well as the Kansas Act Against Discrimination. They argue Doerge as a white person cannot challenge anti-black discrimination at the beauty college except as to her claim that she suffered retaliation for her efforts in opposing race discrimination. The defendants stress that no claim of race discrimination was advanced in Doerge's KHRC complaint, and that racial events — the majority of which involved references to black persons as "colored" — cited by Doerge were minor and not actual discriminatory conduct, and the circumstances of the case do not create any inference of retaliation.

To establish a prima facie case of retaliatory discharge under § 1981, Doerge must show that "(1) [she] engaged in protected opposition to unlawful employment practices[,] (2) the employer took employment action adverse to the employee, and (3) there was a causal connection between the protected activity and the adverse action." *Jeffries v. State,* 147 F.3d 1220, 1231 (10th Cir. 1998).

Contrary to the suggestion in Doerge's response that the court has already rejected a similar argument as to her standing to advance non-retaliation claims of race discrimination, the plaintiff's standing to raise such claims remains an open question. In its prior order (Dkt. No. 85), the court

rejected a motion to dismiss the federal race-based claims, holding merely that § 1981 did not require administrative exhaustion.

The court finds that there is no § 1981 claim in the action for anything other than retaliatory discharge. Doerge states in her summary judgment response that she "distinctly pled a § 1981 claim for forcing her to work in a racially hostile work environment," and cites as support her Amended Complaint. (Dkt. No. 50). But the Amended Complaint is superseded by the Pretrial Order which sets forth only a claim for retaliation:

> 8. 42 U.S.C. 1981
>
> a. Plaintiff engaged in protected opposition to race discrimination by defendants.
>
> b. As a result of this opposition, she was retaliated against and her employment was ultimately terminated.
>
> c. Plaintiff was qualified for her job and satisfactorily performing her job.
>
> d. As a result of her wrongful termination, she suffered damages.

(Dkt. No. 83, at 10). The Pretrial Order does not advance as a theory of recovery under § 1981 Doerge's own damages for having to work in a hostile working environment.

Unlike the claim under § 1981, it is possible to read the Pretrial Order to construe the "KAAD (Race)" as something beyond retaliation alone, since it also alleges that "[d]efendant's racism was enough to alter the terms and conditions of plaintiff's employment." (Id.)

However, summary judgment is appropriate for two reasons. First, Doerge has presented no authority which would establish that she, as a white person, would have standing to present claims of race discrimination against third-party co-workers. In this context, Doerge simply does not fall within the "protected class" protected by the statute.

Even if standing were present, the court finds that Doerge has failed to present a triable case of a racially hostile environment under the KAAD. Doerge in her response recites testimony about racially charged language overheard by other witnesses. But Doerge's claim here is for the hostile environment she experienced, and the evidence presented to the court shows only a very limited

8

number of instances of racially charged language personally observed by Doerge. In one instance, the word "nigger" was used. By Doerge's own account, she immediately objected to the use of the word, and it was never repeated in her presence. In three instances the term "colored" was used to refer to a black person. While such language is generally considered opprobrious in contemporary discourse, the term is far less offensive. Given the limited number of instances of the use of racially hostile language, the relatively less severe nature of some of the terms used, that all of the language was directed at third parties and not the plaintiff, who is white, and all of the circumstances of the case, the court finds that Doerge has not demonstrated that she was forced to endure such a pervasively hostile working environment that it altered the terms and conditions of her working environment.

Doerge makes no attempt to respond to the defendants' argument that the delay in time between the incidents involving racial language and her termination is so long that no inference of causation arises under the law. The delay is sufficient that no inference of causation arises. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001). Doerge supplies no other evidence which would support an inference of causation.

The court finds any claim under KAAD for retaliation for opposing race discrimination should be dismissed for the same reason. And since Doerge's conspiracy claim under 42 U.S.C. § 1985 is grounded on an alleged conspiracy to retaliate for protected opposition to race discrimination, her § 1985 claims are also subject to summary judgment.

The defendants next seek dismissal of Doerge's conspiracy claim on the grounds that it was insufficiently pled and because it alleges a conspiracy between a corporation and its officers. Doerge contends that the conspiracy claim was adequately detailed by referencing her deposition, and argues that the other persons (Chartier and Crum) were not officers and hence could form conspiracy with corporate entity. The court will grant summary judgment as to the conspiracy claim. Merely referencing two pages in plaintiff's own deposition is not the equivalent of pleading fraud with

particularity. The allegation of the plaintiff as articulated in the Amended Complaint and then the Pretrial Order never articulate the claims of conspiracy with any particularity. The pleadings show only conclusory allegations of fraud. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir.1988). Further, the referenced deposition pages themselves do not explicitly state the elements of conspiracy.

The defendants next allege that the court has no jurisdiction over the KAAD clams because Doerge did not exhaust her administrative remedies. They stress that the KHRC never resolved the administrative complaint, merely designating the case as "inactive." They also argue that the plaintiff's claims are not made actionable at law by the 1995 amendment to K.S.A. 44-1005(i), since the KHRC still made no finding of probable cause nor did it dismiss the case, and cite *Sandlin v. Roche Laboratories, Inc.*, 268 Kan. 79, 80, 991 P.2d 883 (1999).

Doerge argues that the KAAD designated the file as "inactive" because in the KHRC's view, a "full value settlement under the KAAD had been offered by defendants, and plaintiff had rejected it." (Dkt. No. 180 at 9). The court finds that this does not create exhaustion. Nothing prevented Doerge from seeking reconsideration of the KHRC's dismissal finding under K.S.A. 44-1010, if she felt that the KAAD settlement was insufficient, or prevented her from appealing any adverse determination on such a reconsideration motion. The court finds that plaintiff did not exhaust her administrative remedies, and accordingly dismisses her claims under KAAD.

Next, the defendants seek dismissal of any race-related claims under the KAAD, since the KHRC claims did not include any mention of race. Doerge responds by stating that this court has previously rejected a similar argument in its prior order. (Dkt. No. 85). But, as noted earlier, this is not correct. The court's finding was explicitly limited to its finding that such exhaustion was not required *under 42 U.S.C. § 1981.* The court's order did not address, explicitly or implicitly, the validity of any race-based claims under KAAD, which does have a requirement for administrative review. Accordingly, the failure of the plaintiff to mention race, or retaliation for opposing racial discrimination, in her KHRC complaint is a sufficient ground for dismissing Doerge's KAAD race-

10

related claims. In the KHRC complaint, Dorge checked the boxes which indicated only that she was subjected to sexual harassment and retaliation, and did not check the box for race. Her narrative focuses exclusively on sexual harassment and retaliation for complaining of sexual harassment. The court finds that under these circumstances, the race-related claims were never presented for administrative review and are accordingly subject to summary judgment. *See Parker v. Housing Authority of Kansas City, Kansas,* 1992 WL 81980 (D.Kan. 1992) (holding under Title VII that claims of race discrimination and sex discrimination are separate and distinct).

Defendants seek summary judgment as to Doerge's claims of defamation, arguing that those claims are barred by the one-year statute of limitations of K.S.A. 60-514. The present action was filed on January 21, 2005. All of the claimed incidents of defamation occurred during 2003. The last allegedly defamatory statement of Jelinek which Doerge can recall happened on March 13, 2003. Doerge has submitted affidavits from other witnesses also indicating that Jelinek made the alleged defamatory statements in 2003. Doerge presents no argument against the application of the statute of limitations, other than to state that the statute should be tolled while she sought her administrative remedies. Doerge provides no authority for such tolling. Where a plaintiff advances multiple claims, some of which are subject to an administrative exhaustion requirement and some of which are not, the pursuit of administrative review as to the former will not toll the statute of limitations as to the latter. *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 465-67, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (administrative review of Title VII allegations does not toll time for filing claim under 42 U.S.C. § 1981), *Christiansen v. United States Dep't of Interior*, 109 F.3d Appx. 373, 2004 WL 2106560, at *2 (10th Cir. 2004) ("there is no basis for tolling the limitations period [as to his Privacy Act claim] while Plaintiff pursued his [Federal Tort Claims Act] administrative claim, because there is no administrative exhaustion requirement when a plaintiff seeks damages under the Privacy Act"). Several courts have explicitly concluded that the pursuit of federal administrative remedies will not toll the statute of limitations as to pendent state common law claims. *Estes v. Allied Signal, Inc.*, 1998 WL 814638 (N.D.Cal. Nov. 12, 1998) (administrative review of plaintiff's

age discrimination claims did not toll time for filing state claims of intentional and negligent infliction of emotional distress), *Abito v. United Airline*, 2000 WL 550043 (N.D.Cal. May 1, 2000) (Title VII administrative review did not toll time for pendent common law claim for wrongful termination in violation of public policy). The court finds that the defamation claims are barred by the one-year statute of limitations.

Defendants also seek dismissal of the defamation claims on the grounds that plaintiff has failed to prove any damages. She has identified no person who heard the alleged defamatory statements who gave them any credence, and has not shown any lost job opportunities, injury to her reputation, or other injury from the alleged defamation. In her Response, Doerge does not attempt to present any facts which would show such an injury. Instead, citing *Gertz v. Welch, Inc.*, 418 U.S. 323 (1974), she argues that no requirement of damages exists if the defamation is "uttered with malice."

Plaintiff misreads *Gertz*, which held that private individuals did not have to meet the "actual malice" standard announced by the Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) for defamation actions by public officials. Private plaintiffs, the Court held, could sue for defamation even if there was no proof of actual malice by the defendant. The Court held:

> This conclusion is not based on a belief that the considerations which prompted the adoption of the *New York Times* privilege for defamation of public officials and its extension to public figures are wholly inapplicable to the context of private individuals. Rather, we endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation. But this countervailing state interest extends no further than compensation for actual injury. For the reasons stated below, we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.
>
> The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms.

> Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact. More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury.

418 U.S. at 348-49.  The Court ruled that the States could not allow private defamation plaintiffs to recover in the absence of proving actual damages.  But nothing in the Court's opinion suggests that it would *require* the States to award presumed damages if actual malice were proven.  The States are free to require actual damages regardless of the degree of malice in the defamation. And Kansas law provides that damages are an element of a claim for defamation. *Zoeller v. American Family Mutual Insurance Co.*, 17 Kan.App.2d 223, Syl. 2 and 3, 834 P.2d 391 (1992).

Following *Gertz*, the Kansas Supreme Court held that "[d]amages recoverable for defamation, whether per se or not, could no longer be presumed but must be proven." *Moran v. State*, 267 Kan. 583, 599, 985 P.2d 127 (1999).  Since the court in that case concluded that the plaintiff had presented evidence of diminished reputation, it expressly declined to decide whether proof of actual malice would permit recovery in the absence of actual damages. 267 Kan. at 593, 985 P.2d at 134 ("we do not reach the second issue raised of whether actual malice would relieve Moran of the burden of showing injury to reputation").

However, there is good reason to believe that Kansas would not permit recovery in a defamation action in the absence of proof of actual damages.  The Kansas Supreme Court has previously rejected a claim where

> plaintiff offered no evidence of harm to his reputation, no evidence of damage by reason of injury to his reputation, no proof of financial loss flowing therefrom. He cannot recover in a defamation action for mental anguish in the absence of proof of the principal injury with which a defamation action is concerned — injury to reputation.

*Gobin v. Globe Publishing Co.*, 232 Kan. 1, 7, 649 P.2d 1239 (1982).  Kansas law understands defamation as "an invasion of the interest in reputation and good name. This is a 'relational' interest since it involves the opinion which others in the community may have, or tend to have, of the plaintiff.' " *Gomez v. Hug*, 7 Kan.App.2d 603, 611, 645 P.2d 916, *rev. denied*, 231 Kan. 800 (1982)

13

(*citing* Prosser, Law of Torts, 4th ed. 1971 at 737). This definitional understanding of defamation strongly suggests that malice is not a substitute for proof of damages. In *Zoeller*, the Court of Appeals concluded that case law "clearly indicates that if the [Kansas Supreme C]ourt were faced with this question, it would decide that Kansas no longer permits recovery based upon the establishment of slander per se." 17 Kan.App.2d at 228. Citing *Zoeller*, the same court later held that "[i]n Kansas, *any* plaintiff in a defamation action must allege and prove actual damages and may no longer rely on the theory of presumed damages." *Wright v. Bachmurski*, 29 Kan. App.2d 595, 29 P.3d 979 (2001) (emphasis added). The court agrees, and believes that the Kansas Supreme Court would also understand "any plaintiff" to include plaintiffs who allege actual malice.

Next, the defendants seek dismissal of Doerge's claim for negligent infliction of emotional distress, arguing that the claim is not recognized under Kansas law. *See Gilliam v. U.S.D. 244 School District,* 397 F.Supp.2d 1282 (D.Kan. 2005). Plaintiff makes no response to the argument. The court will grant summary judgment on the claim.

Defendants also seek summary judgment on Doerge's claim of outrage, the intentional infliction of emotional distress, on the grounds that the alleged conduct cited by the plaintiff simply does not meet the high standard created for the tort in Kansas law. *See Roberts v. Saylor,* 230 Kan. 289, 292-293, 637 P.2d 1175 (1981). Given the two-year statute of limitations for the tort of outrage, K.S.A. 60-513(a)(4), the court can look to those incidents between January 21, 2003 (two years prior to the filing of the federal Complaint) and Doerge's termination less than two months later, on March 13. During that time, Doerge alleges that Charles Crum indicated toward a picture of her boyfriend and said, "I'll kick your ass;" that she watched Crum leer at a student, told her "Cindy, you better watch out" while giving her a "scrunched up face look;" and told her she was a "cunt" who needed to "get laid good and hard." After her termination, Crum once "flipped her off" after seeing her while he was driving. Doerge alleges that Jelinek subjected her to unfounded criticism, terminated her without cause, and pushed her out of her office when she was terminated. The court finds that, however reprehensible or otherwise actionable under other theories of recovery,

14

the incidents cited by the plaintiff do not rise to the level required by Kansas law for the tort of outrage as articulated in *Roberts v. Saylor*.

Next, defendants seek summary judgment on the plaintiff's claim of retaliatory discharge against the individual defendants. Doerge's response advances three arguments. First, she stresses that defendant Jelinek was "not merely a supervisor or a co-worker, but rather the president of the corporation, and the owner of the corporation." (Resp. at 13). Second, she stresses that the KHRC found she "had been retaliated against in many ways, up to and including her discharge." Third, she suffered additional acts of retaliation beyond the discharge, such as increasing her hours per week and the increased scrutiny of her teaching.

Doerge's first argument is unpersuasive in light of *Rebarchek v. Farmers Coop Elevator,* 272 Kan. 546, 561-562, 35 P.3d 892 (2001), which held that the proper defendant in a retaliatory discharge claim is the plaintiff's employer, not individual defendants. *Rebarchek* makes no exception for either an officer or an owner. The holding of that case is that "only the employer is liable for retaliatory discharge." 272 Kan. at 562, 35 P.3d at 904. Doerge's second argument is even less compelling. The question before the court is whether Doerge's whistleblower claim, as articulated in the Pretrial Order, *as supported by the evidence presented here*, is sufficient to warrant trial. The findings of the KHRC on the matter are not controlling. Finally, Doerge's attempt to now reference other retaliatory acts is also unavailing. Doerge's whistleblower argument is articulated in the "THEORIES OF RECOVERY" Section of the Pretrial Order at Paragraph 1(j):

> Defendants wrongfully terminated plaintiff's employment in retaliation for her complaints of violations of state and federal laws to the owner and management of defendant employer and in retaliation for her complaints of violations of state and federal laws to outside agencies. Plaintiff was a whistleblower.

(Dkt. No. 83, at 7-8). Plaintiff's theories of recovery advance no state whistleblower claim for anything other than retaliatory discharge. Nor, even if such allegations had been preserved in the Pretrial Order, does plaintiff present any authority for holding the individual defendants responsible for the additional alleged acts of retaliation.

Finally, defendants present three additional arguments for summary judgment. Plaintiff responds to none of them. First, the argument that plaintiff has no whistleblower claims against any of the defendants, because the underlying allegations would have been independently actionable under the KAAD. *See, e.g., Masters v. Daniel International Corp.,* 917 F.2d 455 (10th Cir. 1990). Second, they seek summary judgment on the plaintiff's express and implied contract claims, arguing that the wage and benefits claims were resolved by the KDHR's resolution of the contract claims and the resulting accord and satisfaction represented by Doerge's acceptance of the settlement check given to her as a result of the KDHR order, and that the remaining contract claims are unsupported in light of decisions such as *Wood v. City of Topeka*, 90 F.Supp.2d 1173, 1193 -1194 (D.Kan.,2000). Finally, the defendants seek dismissal of any remaining supplemental state claims in the event the court dismisses the federal claims. As noted earlier, the plaintiff has not responded to these final three arguments. The court finds each of the arguments persuasive, and grants the requested relief.

IT IS ACCORDINGLY ORDERED this 30th day of May, 2007, that the defendants' Motion for Summary Judgment (Dkt. No. 148) is hereby granted. In light of this order, the court denies as moot the Motions in Limine of the defendants and the plaintiff (Dkt. No. 165, 167, respectively) as well as the Motion to Quash Subpoena (Dkt. No. 177).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE